# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **NOEL G. KREUZER,** | : | **Civil No.  4:24-cv-01904** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **FRANK BISIGNANO,** | : | |
| **Commissioner of Social Security,**[1] | : | |
| | : | |
| **Defendant.** | : | |

## <u>MEMORANDUM OPINION</u>

I.    <u>**Introduction**</u>

For Administrative Law Judges (ALJs), Social Security disability determinations frequently entail an informed assessment of competing medical opinions coupled with an evaluation of a claimant's subjective complaints. Once the ALJ completes this task, on appeal it is the duty and responsibility of the district court to review these ALJ findings, judging the findings against a deferential standard of review which simply asks whether the ALJ's decision is supported by substantial evidence in the record,  <u>see</u> 42 U.S.C. § 405(g); <u>Johnson v. Comm'r of</u>

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012), a quantum of proof which "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).

Yet while this is a deferential substantive standard of review it is also incumbent upon the ALJ to sufficiently articulate the rationale for the decision to allow for meaningful judicial review. Where this duty of articulation is not fully satisfied, a remand is appropriate. This is especially true where an individual's age could direct a finding of disabled under the agency guidelines commonly referred to as the Grids if they are limited to certain exertional categories, for example light work or sedentary work. See 20 C.F.R., Part 404, Subpart P, Appendix 2. For example, "if a claimant who is closely approaching advanced age were found to only be able to undertake sedentary work, the grids would mandate a finding that she is disabled." Wilkerson v. Comm'r of Soc. Sec., 278 F. Supp. 3d 956, 969 (E.D. Mich. 2017) (citing 20 C.F.R., Part 404, Subpart P, Appendix 2, §§ 201.12 and 201.14). Yet, under the grids, if the ALJ concludes that individual is capable of performing light work, the grids could do not direct a mandatory finding of disability. Since this finding is clearly outcome determinative, it is incumbent upon an ALJ to adequately

2

explain what evidence was relied upon in selecting the exertional level at which an individual could perform. Moreover, where the ALJ concludes an individual's abilities fall somewhere between two exertional levels, an ALJ must often rely upon the testimony of a vocational expert in determining which jobs an individual can perform. Id. (citing Ford v. Colvin, 2015 WL 4608136, at *7 (D. Del. July 31, 2015)).

These principles guide our consideration of the instant case where the ALJ issued a partially favorable decision on the plaintiff, Noel Kreuzer's, disability application. The ALJ concluded that Kreuzer could perform a reduced range of light work and the grids would mandate a finding of disabled on December 2, 2023, when his age category changed to an individual of advanced age. In so concluding, the ALJ found the opinions of two consultative examiners partially persuasive, characterizing one of the opinions as supporting the plaintiff's ability to perform light work. Yet, the expert opinions that the ALJ partially credited did not indicate he would be capable of light work, since their standing and walking limitations appear to be below what would be required to perform light work. Moreover, while the ALJ expressly rejected these consultative examiner opinions that the plaintiff could only stand and walk for certain intervals, the ALJ did not directly accept or reject their overall standing and walking limitations which concluded he would not

be able to meet the exertion requirements of light work. The ALJ also did not examine the vocational expert about the specific standing and walking requirements of the jobs identified.

Thus, after a review of the record, we find that the ALJ both mischaracterized the medical opinions of the consultative examiners and failed to adequately explain what parts of these examining source opinions he credited and which he rejected and formulated an RFC that was not based upon substantial evidence. Accordingly, we will remand this case for further consideration by the Commissioner.

## II.    **Statement of Facts and of the Case**

On June 14, 2022, Kreuzer applied for disability benefits, citing an array of impairments, including severe COPD, scarring of lungs, chronic pulmonary issues, heart issues, status post rods and plates in back herniated discs in back, and chronic pain. (Tr. 80). Kreuzer was 52 years old at the time of the alleged onset of his disability, November 21, 2021, and had prior employment as a mechanic. (Tr. 53, 80).

With respect to these alleged impairments, the clinical record, medical opinions, and Kreuzer's activities of daily living revealed the following: The plaintiff suffers from a cascade of heart and lung impairments which, in relevant

part, significantly affect his breathing.[2] At the hearing the plaintiff testified that he left his job when he started having breathing problems which continued to get worse in current years due to his heart and lungs. (Tr. 54-55). He stated that he cannot do anything without being short of breath and that sometimes if he goes just from his living room to his bathroom, he is so short of breath that he has to use his nebulizer. (Tr. 55). The plaintiff testified that he relies on help from family to help him with everyday tasks like grocery shopping because he can do "very, very, very little" physical activity. (Tr. 56). He further stated that he cannot shower because of the steam, uses his nebulizer every two hours, cannot sleep at night due to low oxygen, has chest tightness, and has at least two days per week he cannot do anything. (Tr. 57-59).

With respect to the medical records, they tend to support the plaintiff's allegations that his shortness of breath caused exertional limitations. Indeed, the plaintiff repeatedly complained of dyspnea on exertion both to his treating cardiologist and pulmonologists. Specifically, in November 2020 he returned to

---

[2] The ALJ also found the plaintiff's degenerative disc disease to be severe, and the plaintiff testified that he has pain in his shoulders and back for which he is attending physical therapy. (Tr. 60). While we do not directly address the evidence of the plaintiff's back and neck impairments, on remand, these impairments should be addressed along with the plaintiff's heart and lung impairments to determine the exertional level at which he can perform work.

cardiologist Dr. David Dalessandro complaining of chest tightness and productive cough. Dr. Dalessandro reported a history of hypertension, dyslipidemia, long-term heavy tobacco abuse with COPD, and lumbar surgery with rod implantation. (Tr. 445). He noted the plaintiff had not been seen at their office since 2018. (Id.) An examination revealed decreased breath sounds with scattered rhonchi. (Tr. 446). Dr. Dalessandro recommended left heart cardiac catheterization due to the plaintiff's persistent chest discomfort and shortness of breath with risk factors for coronary artery disease. (Id.) November 2020 heart catheterization showed ischemic heart disease and plaque stenosis in the RCA that required stenting (Tr. 450-51). He required repeat heart catheterization in December 2020. (Tr. 448).

At a May 2021 follow-up, Dr. Dalessandro noted that the repeat catheterizations showed 90% ulcerated plaque in the distal right coronary artery which was successfully stented but he again underwent catheterization in December 2020 because of dyspnea on exertion and recurrent chest discomfort. (Tr. 858-59). Although at the time he denied chest pain and shortness of breath, the examination revealed decreased breath sounds but relatively clear lungs. (Tr. 859-60).

In July 2021 Kreuzer reported occasional cough, wheezing, and shortness of breath to his primary care provider, Dr. Daniel Dudrick. (Tr. 384). The examination again revealed decreased breath sounds but no dyspnea. (Tr. 386). In August 2021

he again reported to Dr. Delassandro chronic dyspnea on exertion with some improvement with his nebulizer. (Tr. 853). Dr. Delassandro stated the plaintiff was stable from a cardiac standpoint. (Tr. 853). Meanwhile August 2021 pulmonary functioning test showed moderate obstruction, (tr. 913), and an October 2021 chest CT showed mild emphysema and mild diffuse peribranchial thickening but no major branch pulmonary embolus. (Tr. 915). He again complained of chronic persistent dyspnea on exertion at a December 2021 follow-up with Dr. Delassandro who noted he would be seen by the pulmonary clinic at Temple in January 2022. (Tr. 847).

In January 2022 he was seen by a pulmonary specialist at Temple Health who noted the plaintiff had experienced dyspnea with activities of daily living for two years and had been hospitalized twice in the past year for shortness of breath. (Tr. 920). He reported that he had been smoking since 1983 but had cut down to two to three cigarettes per day. (Id.) The pulmonologist noted evidence of moderate airflow obstruction. (Id.) He was determined to be a candidate for a total lung denervation trial based on his multiple severe and moderate exacerbation episodes over the prior year, but he was informed he would need to abstain from smoking for two months to participate and was provided no smoking cessation aids, instead indicating he would stop "cold turkey." (Tr. 927-28).

In May 2022 he began seeing Dr. James Martino for a pulmonology evaluation and it was noted that he did not participate in the trial. (Tr. 891). His COPD was described as "severe" with "frequent exacerbation worse since exposure to a lawn mower on fire in summer 2020," and that he "remains heavily symptomatic with [shortness of breath] with any activity." (Id.) Dr. Martino noted "he has been on and off steroids for COPD exacerbations and significantly symptomatic disease in past year requiring he miss work a couple times per month and more so in past few months." (Id.) At the time he had not worked in six months. (Id.) His MMRC score was 3, indicating that he must stop due to dyspnea after walking 100 yards, or after a few minutes, (tr. 73), and it was noted that he cannot climb steps. (Tr. 891). Although it noted Kreuzer was a cigarette smoker, notes also indicated he had worked in numerous jobs at high risk including in a fiberglass factory, welding, fork lift, and diesel mechanic, (id.), and that he had been exposed to asbestos as a child. (Tr. 1160). Dr. Martino increased his dose of Trelegy but stated there was "unfortunately not much to offer," in terms of treatment. (Tr. 892).

Following an abnormal stress test in April 2022, repeat heart catheterization was performed, but it was determined no significant coronary disease was present. (Tr. 786-90, 817). Thus, in February 2023, Dr. Dalessandro stated Kreuzer appeared stable from a cardiac standpoint. (Tr. 961). Nonetheless, the plaintiff continued to

8

complain of chronic, persistent shortness of breath on exertion with chest discomfort to his cardiologist, Dr. Dalessandro throughout 2022 and 2023. (Tr. 842, 1455, 1461, 1468, 1474).

In April 2023, Kreuzer was seen by CRNP Adomiak for his COPD and reported shortness of breath with minimal exertion, including showering and washing dishes and chronic, productive cough. (Tr. 1159). He reported using his nebulizer at least twice per day and needing prednisone at least once per year. (Id.) At a follow-up in August 2023, he reported that his shortness of breath was slightly worse, and a CT scan was performed for cancer screening which was negative for lung cancer but revealed moderate coronary artery calcification. (Tr. 1371-72). Dr. Dalessandro suggested a repeat stress test for his increasing exertional dyspnea, but he declined. (Tr. 1457). Instead, a follow-up echocardiogram and arterial Doppler were performed which revealed moderate to severe centra aortic regurgitation, which contributed to his shortness of breath, and peripheral vascular disease. (Tr. 1465-69). Dr. Dalessandro noted it was difficult to assess the symptomatology with regards to the plaintiff's shortness of breath and whether it was from his COPD and/or aortic insufficiency given his underlying significant lung disease with continued smoking. (Tr. 1468).

In February 2024, Dr. Dalessandro noted, "at present patient appears to be a New York Heart Association functional class III due to his underlying pulmonary and cardiac conditions," (tr. 1477), which indicates marked limitations in activity due to symptoms, that the individual is "comfortable only at rest," and that ordinary activity causes fatigue, palpitation, shortness of breath or chest pain.[3]

In March 2024, although the plaintiff's pulmonologist stated his "breathing is stable" it was also noted that his "symptoms [were] not controlled" and that his activity level was primarily sedentary. (Tr. 72-73). Moreover, the plaintiff scored a 4 on the MMRC scale indicating "cannot leave house; dyspnea with dressing/undressing" (Tr. 73). He was using his albuterol nebulizer every four hours (Tr. 73). A pulmonary functioning test revealed moderate obstruction, moderate coronary artery calcification, emphysema, and mild bronchial wall thickening suggestive of chronic bronchitis .(Tr. 75-77). He was offered a three-minute walking test to assess whether he needed to be put on oxygen but declined. (Tr. 77).

Thus, the overwhelming medial evidence indicated that the plaintiff's cardiac and pulmonary impairments caused him significant shortness of breath which persisted with minimal exertion including performing everyday activities.

---

[3] https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure

Two consultative examiners also examined the plaintiff during the relevant period. On January 4, 2023, CRNP Kelly Shultz conducted an examination of the plaintiff during which he reported he was "basically short of breath all the time," triggered by heat, humidity, general overproduction of phlegm, and exertion and used an albuterol nebulizer and/or MDI every two hours. (Tr. 939). Her physical examination showed mild shortness of breath at rest and mild dyspnea on exertion but normal gait, ability to walk on heels and toes without difficulty, squat 80%, normal stance, and mild tremor of bilateral hands but full grip strength. (Tr. 941-42). Nonetheless, she considered his prognosis to be poor. (Id.)

Two months later, on March 15, 2023, Dr. Melia Konecke also conducted a consultative examination of the plaintiff which revealed similar findings, including minimal dyspnea at times during the evaluation but normal gait, ability to walk on heels and toes without difficulty, full squat, normal stance, intact hand and finger dexterity. (Tr. 973-74). A pulmonary function study showed reduced function and mildly reduced diffusion capacity and the consultative examiner explained reduced functioning could indicate coexisting restriction. (Tr. 974). She described his prognosis as fair. (Id.)

After examining the plaintiff, both consultative examiners concluded Kreuzer would have limitations in his ability to stand and walk due to his shortness of breath.

11

Based upon her examination of the plaintiff, CRNP Shultz opined he could sit for eight hours total but could only stand and walk for two hours total in an eight-hour workday and could only stand and walk for fifteen minutes at one time. (Tr. 944). She explained that the limitations for standing and walking were due to his dyspnea on exertion and reduced squat. (Id.) CRNP Schultz also opined that the plaintiff could only occasionally reach, handle, finger, feel, push, and pull due to tremors and could only frequently operate foot controls due to shortness of breath. (Tr. 945). CRNP Shultz also opined the plaintiff could only occasionally perform all postural maneuvers except he could never climb ladders or scaffolds. (Tr. 946).

Like CRNP Shultz, Dr. Konecke opined that the plaintiff could only walk for fifteen minutes at one time and stand for thirty minutes at one time, but could stand for four hours, walk for three hours, and sit for eight hours total in an eight-hour workday. (Tr. 977). Dr. Konecke also opined that the plaintiff would be limited to only occasional postural maneuvers except he could never climb ladders or scaffolds, kneel, or crawl. (Tr. 979). These consultative examiner opinions were remarkable in that, in some ways they reflected the ability of the plaintiff to perform some limited work-related activity, yet they unanimously concluded he would not be able to meet the standing or walking requirements of light work.

12

The plaintiff's treating cardiologist, Dr. Dalessandro, who had a longstanding and thorough treating relationship with the plaintiff, also concluded the plaintiff would be limited in his ability to stand and walk due to his cardiac and pulmonary impairments, although Dr. Dalessandro's opinion was even more restrictive than that of the consultative examiners. On September 19, 2023, Dr. Dalessandro opined that the plaintiff could sit, stand, and walk for less than two hours in an eight-hour workday, could rarely lift less than ten pounds and rarely perform any postural activity, except he could never climb ladders. (Tr. 1405). Dr. Dalessandro also opined the plaintiff would need to lie down or take unscheduled breaks every two hours and would be off-task 25% or more of a normal workday. (Tr. 1406).

Against this treating and examining source consensus that the plaintiff would be unable to meet the standing/walking requirements of light work, two non-examining, non-treating State agency experts opined that the plaintiff could indeed perform light work in that he could occasionally lift and/or carry twenty pounds and frequently carry ten pounds and could stand and/or walk about six hours in an eight-hour workday and sit for six hours in an eight-hour workday. (Tr. 84, 95)

It was against the backdrop of this evidence that the ALJ conducted a hearing in Kreuzer's case on June 10, 2024. (Tr. 40-67). Kreuzer and a vocational expert ("VE") both testified at this hearing. At the hearing, the vocational expert testified

13

that the plaintiff could not perform his past work if he were limited to sedentary work, but the ALJ did not ask the vocational expert if the plaintiff could perform the jobs identified if limited to sedentary work or if confined to the overall standing and walking limitations opined by the consultative examiners. (Tr. 64).

Following this hearing on July 18, 2024, the ALJ issued a partially favorable decision, denying Kreuzer's application for benefits prior to December 2, 2023. (Tr. 17-39). In that decision, the ALJ first concluded Kreuzer had not engaged in substantial gainful activity since November 21, 2021, the alleged onset date. (Tr. 22). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Kreuzer had the following severe impairments: Chronic obstructive pulmonary disease (COPD), asthma, obstructive sleep apnea syndrome, coronary artery disease, hyperlipidemia, hypertension, ischemic heart disease, degenerative disc disease of the cervical and thoracic spine and history of lumbar fusion. (Tr. 22-23). At Step 3 the ALJ determined that none of these impairments met or medically equaled the severity of any of the listed impairments. (Tr. 24-25).

Between Steps 3 and 4 the ALJ concluded that Kreuzer retained the following residual functional capacity ("RFC"):

> After careful consideration of the entire record, the undersigned finds that since November 21, 2021, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant could occasionally balance, stoop, kneel, crouch,

crawl and climb ramps and stairs. The claimant could never climb ladders, ropes or scaffolds. The claimant must avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dust, gases, poor ventilation and other pulmonary irritants, and hazards.

(Tr. 25).

In reaching this RFC determination, the ALJ considered the medical evidence as well as the opinion evidence. As to the medical opinion evidence, the ALJ first considered the opinions of the consultative examiners and concluded they were both partially persuasive. Yet, the ALJ's analysis of these opinions both mischaracterized the exertional level they opined the plaintiff was capable of performing and failed to adequately explain which limitations the ALJ concluded were persuasive and which were unpersuasive. Specifically, as to the opinion of CRNP Shultz, the ALJ stated she had opined the plaintiff could perform a range of light exertional work with standing and walking for four hours total, two hours each, in fifteen-minute increments. In fact, CRNP Shultz opined the plaintiff could stand for two hours total in an eight-hour workday and walk for two hours total in an eight-hour workday.[4]

---

[4] Thus, to the extent the ALJ characterized this as "four hours total" it is unclear whether he misstated the opinion of CRNP Shultz or considered her to believe these two abilities could somehow be performed consecutively and independent of one another. Moreover, as explained below, even an ability to stand and walk for four hours total, which is actually above the amount CRNP Shultz opined the plaintiff could perform, is not equivalent to light work which requires at least six hours of standing and walking in an eight-hour workday.

The ALJ then explained that he accepted CRNP Shultz's opinion as persuasive "as to exertional ability, postural abilities, and need for some level of environmental limitations," but did not find persuasive "the reductions to certain intervals of sitting, standing and walking." (Tr. 28). But the ALJ did not explain whether he was rejecting CRNP's opinion that the plaintiff was capable of standing and walking only two hours in a workday, less than the standing and walking requirements of light work, or whether he simply erroneously considered her opinion to conclude the plaintiff could perform light work.

The ALJ similarly found the opinion of Dr. Konecke partially persuasive, but also only expressly addressed her limitations to fifteen-minute intervals of sitting, standing and walking but did not explain whether he expressly rejected her opinion that the plaintiff was not capable of the overall standing and walking requirements of light work. (Tr. 28).

The ALJ then rejected the opinion of the plaintiff's treating cardiologist, explaining it was not well explained in specific objective diagnostic or clinical findings, included subjective reports of limitation from the plaintiff, and was inconsistent with cardiology records and the most recent consultative examination findings showing only "minimal dyspnea" at times during the examination. (Tr. 29-30). But the ALJ did not explain the consistency of all of the treating and examining

16

source opinions that the plaintiff would be limited to less than light work due to his inability to stand and walk for long periods due to his shortness of breath.

Instead, the ALJ accepted the opinions of the non-treating, non-examining sources concluding that the plaintiff was capable of light work. (Tr. 30). The ALJ then found at Step 4 that Kreuzer could not perform his past work, but found at Step 5 that, prior to December 2, 2023, the date the plaintiff's age category changed, he retained the capacity to perform other jobs that existed in significant numbers in the national economy and thus the plaintiff was not disabled prior to that date. (Tr. 31). Nonetheless, considering the plaintiff's age, education, work experience, and RFC, once he became an individual of advanced age on December 2, 2023, the grids directed a finding of disabled. (Tr. 32).

This appeal followed. (Doc. 1). On appeal, Kreuzer challenges the adequacy of the ALJ's evaluation of the medical opinion evidence, arguing that the ALJ rejected the treating and examining source opinions for erroneous reasons and, thus, failed to incorporate all of the plaintiff's credibly established limitations in the RFC. As discussed in greater detail below, because the ALJ mischaracterized the medical opinion evidence and failed to adequately address the standing and walking limitations opined by the consultative examiners, an issue which is clearly outcome determinative in this case, we conclude that the medical evidence evaluation in this

17

case was not supported by substantial evidence. Accordingly, we will remand this decision for further consideration by the Commissioner.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision]

18

from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether Simon is disabled, but rather whether the Commissioner's finding that [she] is not disabled is supported by substantial evidence and was reached based upon a correct application of the

19

relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

20

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.      Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); <u>see also</u> 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful

21

activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and RFC. 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's RFC. The RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett, 220 F.3d at 121 (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable

22

impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018); Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017)..

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

23

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

### C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of

24

fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.
>
> An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented

by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions.

When presented with a disputed factual record, it is well-established that "[t]he ALJ

– not treating or examining physicians or State agency consultants – must make the

ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667

F.3d 356, 361 (3d Cir. 2011). However, the ALJ must still fully articulate the basis

of this medical opinion evaluation. Thus, when evaluating medical opinions "the

ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the

wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066).

These legal benchmarks guide us in the instant case.

**D.    This Case will be Remanded for Further Consideration by the Commissioner.**

As we have noted, an ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter, 642 F.2d at 704. Furthermore, the ALJ must also "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck, 181 F.3d at 433. This cardinal principle applies with particular force to several types of assessment made by ALJs. With respect to the instant case, it is well settled that "[t]he ALJ must consider all relevant evidence when determining an individual's residual functional capacity." Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001). Therefore, an ALJ must "explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000).

In the instant case, we conclude that the ALJ's RFC determination is not supported by an adequate explanation. At the outset, the ALJ's assessment of the opinions of the consultative examiners is flawed in at least two ways. First, the assessment of CRNP Shultz's opinion was based upon the incorrect proposition that

27

she concluded the plaintiff was capable of light work. Indeed, the ALJ stated "Practitioner Shultz opined the claimant could perform a range of light exertional work with standing and walking for four hours total, two hours each, in fifteen-minute increments." (Tr. 27). Yet, CRNP Shultz actually opined that the plaintiff could only stand for two hours total and walk for two hours total in an eight-hour workday, not four hours total. (Tr. 944).

Moreover, as the plaintiff points out, the regulations indicate that a full range of light exertional work requires up to six hours of standing and walking per day. Both consultative examiners opined that the plaintiff was capable of less than that. Indeed, CRNP Shultz opined the plaintiff was capable of only two hours of standing and walking total per day; (tr. 944), Dr. Konecke opined that the plaintiff could only stand for four hours and walk for three hours total in an eight-hour workday; (tr. 977), and both concluded the plaintiff could only walk for fifteen-minute increments. (Id.) However, the ALJ only rejected the opinions of the consultative examiners as to the "limitations to intervals of sitting, standing, and walking" but did not directly accept or reject the overall standing/walking limitations opined by these experts which would have limited the plaintiff to sedentary work. Without more explanation on the part of the ALJ, it is impossible to discern which parts of these opinions he found persuasive, specifically with regard to the essential abilities to stand and walk

28

for a period which is compatible with the RFC, and if these limitations were rejected, "explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination." Burnett, 220 F.3d at 121.

This is particularly relevant where, in our view, the opinions of these consultative examiners with regard to the plaintiff's exertional abilities, while less restrictive, are consistent with the opinion of his treating cardiologist that his exertional dyspnea would cause him to be significantly limited in his ability to stand and walk for long periods. Moreover, the medical records tend to support the plaintiff's allegations that his shortness of breath caused exertional limitations. Indeed, the plaintiff repeatedly complained of dyspnea on exertion both to his treating cardiologist and pulmonologists, (tr. 842, 1455, 1461, 1468, 1474), he reported dyspnea with activities of daily living, (tr. 920), he experienced moderate airflow obstruction on examination, (id.), his COPD was described as "severe" and he was described as "heavily symptomatic with [shortness of breath] with any activity," which as affecting his ability to work, (tr. 891), and his ability to perform activities of daily living including showering and washing dishes. (Tr. 1159).[5]

---

[5] Moreover, while we do not necessary conclude the ALJ erred in concluding the plaintiff's inability to stop smoking was an indication that his symptoms were not as severe as he alleged, in our view, the issue of smoking cessation and tobacco addiction is not quite so cut and dry. Indeed, the plaintiff had smoked for thirty years and there is some evidence he had cut back due to his impairments. (Tr. 920).

29

Kreuzer was classified as MMRC 3 or 4 indicating he must stop due to dyspnea after walking 100 yards, or after a few minutes, (tr. 73), and "cannot leave house; dyspnea with dressing/undressing," (tr. 73), it was noted that he cannot climb steps, (tr. 891), and he was classified as an American Heart Association functional class III, indicating he had marked limitations in activity due to symptoms, was "comfortable only at rest," and that ordinary activity causes fatigue, palpitation, shortness of breath or chest pain. (Tr. 1477). By March 2024, it was noted that his "symptoms [were] not controlled" and that his activity level was primarily sedentary. (Tr. 72-73). Against this evidence, in our view, the consistency of the treating opinions and their supportability in terms of the medical evidence was not fully addressed by the ALJ, specifically because of the mischaracterization of these consultative examiner opinions.

These errors were compounded by the fact that the ALJ failed to question the vocational expert about whether the standing and walking limitations opined by the two consultative examiners would prohibit the plaintiff from performing the jobs

---

Further, while it is undisputed that his treating providers repeatedly encouraged him to quit smoking, he was provided no smoking cessation aids when informed he needed to quit for a medical trial. (Tr. 927-28). Finally, his providers also noted other risk factors that had contributed to his lung conditions including his work in numerous high-risk jobs and the fact that he had been exposed to asbestos as a child. (Tr. 891, 1160).

identified. Indeed, the ALJ only asked the VE if a person limited to sedentary work could perform the plaintiff's past work, to which he answered no, but did not ask if a person limited to sedentary work could perform the jobs identified in the decision which the ALJ concluded the plaintiff could perform. Moreover, the ALJ did not ask the VE if a limitation to four hours of standing and walking per day, which the ALJ erroneously concluded CRNP Shultz opined the plaintiff could perform, would preclude him from performing these jobs. This is important since, "a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b) & 416.967(b). Moreover:

> [T]he SSA has explained that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." Trudnak v. Berryhill, No. 17-cv-195-LM, 2018 WL 2058103, at *4 (D.N.H. May 3, 2018) (quoting SSR 83-10, 1983 WL 31251, at *6 (S.S.A. 1983) ). As for "sitting most of the time," the court presumes that the regulation is intended to track the sitting requirement for sedentary work, which is defined as "work performed primarily in a seated position," SSR 83-10, 1983 WL 31251, at *5, and which entails sitting for "approximately 6 hours of an 8-hour workday," id.

Baillargeon v. Berryhill, 359 F. Supp. 3d 172, 180 (D.N.H. 2019). Without clarification from the vocational expert, it is unclear whether the identified jobs are

31

those which require "a good deal of walking or standing," or are more akin to sedentary work performed in a seated position. [6]

In sum, more is needed here by way of explanation before the ALJ can reject the opinion of every source that examined the plaintiff that he could not perform the standing and walking requirements of light work. This is particularly true in this case, where the outcome was heavily dictated by the exertional level of the RFC, since "if a claimant such as plaintiff—a person who is closely approaching advanced age—were found to be able only to undertake sedentary work, the grids would mandate a finding that she is disabled." Wilkerson, 278 F. Supp. 3d at 969.[7]

---

[6] Either way, CRNP Shultz's opinion, which the ALJ partially credited as to the exertional level opined, may preclude the plaintiff's ability to perform both types of light work, since she both opined the plaintiff could only stand and walk for two hours total in an eight-hour workday and that he could only occasionally reach, handle, finger, feel, push, and pull due to tremors and could only frequently operate foot controls due to shortness of breath. (Tr. 945).

[7] Moreover, as Wilkerson aptly explains, "In situations where the claimant's ability is somewhere "in the middle, [of two exertional levels] Agency policy advises using a vocational expert," when applying the Grids. Wilkerson, 278 F. Supp. 3d at 969 (citing Ford v. Colvin, 2015 WL 4608136, at *7 (D. Del. July 31, 2015)). The consultative examiner opinions partially credited by the ALJ at most indicate the plaintiff's RFC at least fell somewhere in between light and sedentary. Thus, the ALJ should have directly questioned the vocational expert on the standing/walking requirements of each identified job and reconciled these requirements with his assessment of the medical opinion evidence he partially credited.

Therefore, we conclude that the ALJ's decision in this case is not supported by substantial evidence, as the ALJ did not offer an adequate explanation as to what parts of the consultative examiner opinions were persuasive and mischaracterized the medical opinion evidence as to the plaintiff's ability to stand and walk. Accordingly, we will remand this case to the Commissioner for further consideration of this evidence. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.    Conclusion

Accordingly, for the foregoing reasons, IT IS ORDERED that this case be REMANDED to the Commissioner for further consideration.

An appropriate order follows.

Dated: June 30, 2026

/s/ Martin C. Carlson
Martin C. Carlson
United States Magistrate Judge

33